PEOPLE v. GOODMAN et al. (No. 276/115.)

(Supreme Court, Appellate Division, Third Department. November 10, 1915.)

1. CRIMINAL LAW ⨉⇒309—EVIDENCE—PRESUMPTION—CHARACTER OF ACCUSED.
    Where, in a prosecution for crime, no evidence was given of defendant's good character and reputation, such character could not be presumed.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 738; Dec. Dig. ⨉⇒309.]

2. CRIMINAL LAW ⨉⇒511—EVIDENCE—ACCOMPLICE TESTIMONY—SUFFICIENCY OF CORROBORATION.
    In a prosecution for conspiring to procure the burning of a building, evidence corroborating the testimony of defendants' accomplice against them *held* insufficient to authorize conviction, under Code Cr. Proc. § 399, providing that a conviction cannot be had upon the uncorroborated testimony of an accomplice.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1128–1137; Dec. Dig. ⨉⇒511.]

Appeal from Trial Term, Columbia County.

Isadore Goodman and others were convicted of conspiracy to procure the burning of a building, and they appeal. Reversed, and new trial directed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Duntz & Herzberg, of Hudson, for appellants Goodman, Maskin, Cohen, and Lutsker.

William J. DeLamater, of Hudson (Martin L. Stover, of New York City, of counsel), for appellant Dworett.

John C. Tracy, Dist. Atty., of Hudson (J. Rider Cady, of Hudson, of counsel), for the People.

SMITH, P. J. [1] The appellants, with the exception of Dworett, were all stockholders in the Clermont Ice Company, selling ice for consumption in the city of Hudson. This company was organized March 1, 1912. Upon January 3, 1914, the Lombard Ice Company, Incorporated, was organized and became a rival in business. The defendant Dworett was an officer of the Lombard Ice Company. It does not appear whether or not he was a stockholder thereof, or to what extent he was financially interested in the corporation. The

⨉⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

conspiracy charged is a conspiracy whereby Dworett, for compensation to be paid by the other defendants, should burn the buildings of the Lombard Ice Company. The defendants are all of them Russians. No evidence was given of their good character and reputation, and without such evidence such character cannot be presumed. People v. Lingley, 207 N. Y. 406, 101 N. E. 170, 46 L. R. A. (N. S.) 342, Ann. Cas. 1913D, 403. The crime is sought to be proven by the testimony of one Benjamin Wishengrad, who was also a stockholder in the Clermont Ice Company, and who was a co-conspirator with the defendants. If the evidence of an accomplice were sufficient upon which a conviction might stand, then clearly this judgment of conviction should be affirmed. The testimony of Wishengrad is clear and circumstantial, which might have carried conviction to the minds of the jurors. By section 399 of the Code of Criminal Procedure, however, a conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime. The question remains, then, for us to consider and determine, whether within this rule of proof there was sufficient corroboration of this accomplice to authorize the judgment rendered.

[2] According to the evidence of Philip Wishengrad the defendant Dworett met him one Sunday upon the street, and told him that he wanted to talk with the manager of the Clermont Ice Company, Morris Goodman, and wanted to meet him at 3 o'clock out of town, and where they could not be seen. Philip Wishengrad swears that he communicated with Morris Goodman, and that Goodman told him that he would meet him at the company's barns at 3 o'clock that afternoon. The evidence of both Philip and Benjamin Wishengrad is to the effect that Dworett did go to the company's barns, and there met Morris Goodman and the other defendants, and that there were present four women, wives of various defendants. Philip Wishengrad was then told to leave, and knows nothing further about the transaction. Morris Goodman then took Dworett aside and had a private talk with him. Thereafter Dworett left, and Morris disclosed to the other defendants the plan suggested by Dworett, whereby he was to burn the buildings of the Lombard Ice Company for $1,000. Six hundred dollars was to be paid immediately after the buildings were burned, and $400 was to be paid the January following. Until the buildings were burned the $600 was to be put in the hands of one Solomon in New York. Wishengrad further swears that thereafter, at a meeting in the offices of the Clermont Ice Company, a check for $600 was drawn to the order of cash. This check was thereafter reduced to $500, the money obtained one afternoon from the bank, and Goodman upon the same afternoon went to New York, stating that he was going to take it to Solomon. One hundred dollars in cash was taken from the company's safe. The check is produced in evidence, and the check book, wherein the stub opposite this check shows a check for $600 reduced to $500, and in the stub is the words "Pay roll"; also the words "Back pay." It appears further that when these defendants

were released on bail the defendants Goodman and Dworett went almost immediately to New York and saw Solomon, which fact is claimed to be further corroborating evidence. These conversations and negotiations are denied in toto by every one of the defendants. They explain the $500 check as a payment, together with $100 in the cash·drawer, to the six stockholders of the corporation upon back pay, $100 to each one. It appears uncontradicted that they had not been paid their wages or salaries for 16 weeks. The moneys earned by the corporation had to be put back into the business of the corporation. Their testimony is to the effect that they had this money on hand, and, not having been paid for this period of time, they took the opportunity to distribute among the stockholders this $600. They are to an extent corroborated by some of the wives of the defendants, who swear that their husbands delivered over to them about this time $100 as having been paid to them by the company, and one of the women swears somewhat in detail as to what application she made of that $100. To my mind the most suspicious fact in the whole case is the failure of the defendants to put Solomon upon the witness stand. He was their friend.

Another fact claimed to be in corroboration of the testimony of Wishengrad is that Solomon was in Hudson about the time of these negotiations; the defendants swearing, however, for the purpose of purchasing ice. There were evidently business negotiations between Solomon and the defendants. They failed to bring Solomon upon the stand to swear that he never received $600 or to explain the object of the visit of Goodman and Dworett to him in New York immediately after they were discharged from arrest. While, however, the fact of the failure to call Solomon is suspicious, it cannot be accounted as corroborative evidence of the story of the accomplice. It appears that it was not the custom to make payments to these stockholders by a check in gross, as is claimed by the defendants to have been done at this particular time. From these facts recited the court must find corroboration of the accomplice, if such corroboration here exists. A careful examination thereof in relation to the other testimony in the case leads to the conviction that the requirement of the law has not been satisfied, and that the accomplice has not been corroborated. The testimony of Philip Wishengrad that Morris asked for an appointment with the manager of Morris Goodman, alone and out of town, is singularly complied with by the appointment at the Clermont Company's barn that Sunday afternoon in the presence of all of the defendants and four of their wives. If Dworett had been so anxious to confer with Goodman alone, where he could not be seen, he would hardly have conducted the negotiations in the presence of so many, although out of hearing. In view of the fact that these defendants had not received pay for 16 weeks, confessedly, the drawing of this check for $600 as claimed by the defendants for distribution among them, can hardly be deemed corroborative proof that the money was drawn for an evil purpose in a conspiracy for the commitment of a crime. The fact that the payment was irregular, or made in a differ-

ent mode from the way moneys were usually distributed among these stockholders, has no great significance. There is evidence that at this time Solomon was telephoned in New York from the office of the Clermont Ice Company. This might well have been on some business transaction, and one witness swears that Wishengrad afterwards stated that the telephone was in reference to the purchase of ice. The requirement of the statute is that the corroboration must be by evidence tending to connect the defendants with the commission of the crime. All of these facts claimed to be in corroboration of the testimony of Wishengrad would have no significance whatever apart from Wishengrad's testimony, and in themselves have no significance as establishing or tending to establish the commission of a crime. They are all of them consistent with lawful conduct, and I am unable to find in any of this evidence such corroboration as I deem to be required by the provision of the Code of Criminal Procedure cited. Wishengrad had become hostile to the other defendants. It, of course, may be argued that only in such a case would an accomplice be induced to reveal the commission of a crime. But if this transaction at the office of the Clermont Company, where this check was drawn and the money obtained, and the telephone to Solomon, all occurred in the manner as testified to by the defendant, it might well give color of a crime charged by one of the parties with hostile motive, and if the requirement of corroborative evidence to the testimony of an accomplice be based upon sound reason, that requirement would be a flimsy shield to an innocent party against the malevolence of his colleague, if these facts alone might be deemed corroboration, in case the colleague claimed a conspiracy to commit a crime.

These views lead to a reversal of the judgment of conviction and the direction for a new trial. All concur.