The People of the State of New York, Respondent, *v.* George Hetenyi, Appellant.

Argued January 21, 1952; decided April 23, 1952.

*George J. Skivington* and *George J. Skivington, Jr.*, for appellant. I. The trial court erred in admitting into evidence the gun holster and in its other rulings in connection therewith. (*People* v. *Woltering*, 275 N. Y. 51; *People* v. *Kinney*, 202 N. Y. 389; *People* v. *Hill*, 198 N. Y. 64; *People* v. *Del Vermo*, 192 N. Y. 470; *Wurtzman* v. *Kalinowski*, 233 App. Div. 187; *People* v. *Jackson*, 255 App. Div. 688; *People* v. *Giordano*, 213 N. Y. 575; *People* v. *Razezicz*, 206 N. Y. 249; *People* v. *Galbo*, 218 N. Y. 283; *People* v. *Suffern*, 267 N. Y. 115; *People* v. *Lewis*, 275 N. Y. 33.) II. Prejudicial error was committed in the summation of the District Attorney. (*People* v. *Wolf*, 183 N. Y. 464; *People* v. *Minkowitz*, 220 N. Y. 399; *People* v. *Watson*, 216 N. Y. 565; *People* v. *Leavitt*, 301 N. Y. 113; *People* v. *Forte*, 277 N. Y. 440; *People* v. *Fielding*, 158 N. Y. 542.) III. Prejudicial error was committed by the District Attorney in his summary in ascribing to defense counsel knowledge on the subject as to where the crime was committed. IV. The District Attorney's attack upon defendant on religious grounds and on defendant's changes in religion were prejudicial.

*Clarence J. Henry, District Attorney* (*Harry L. Rosenthal* and *John C. Little, Jr.*, of counsel), for respondent. I. The gun holster was properly received in evidence. (*People* v. *Bonier*,

189 N. Y. 108; *People* v. *Neufcld,* 165 N. Y. 43; *Wilson* v. *State,* 161 Md. 1; *People* v. *Radovich,* 122 Cal. App. 176; *People* v. *Del Vermo,* 192 N. Y. 470.) II. The comments of the District Attorney in summation were not unduly prejudicial. (*Ruloff* v. *People,* 45 N. Y. 213; *People* v. *Priori,* 164 N. Y. 459; *Williams* v. *Brooklyn Elevated R. R. Co.,* 126 N. Y. 96; *People* v. *Watson,* 216 N. Y. 565.) III. No error was committed by the prosecution reference to appellant's changes in religion. IV. There was ample evidence to warrant the submission to the jury of the question as to whether deceased was killed in Monroe County, and to sustain a finding to that effect. (*Commonwealth* v. *Costley,* 118 Mass. 1; *Commonwealth* v. *Knowlton,* 265 Mass. 382; *Hawkins* v. *State,* 60 Neb. 380; *People* v. *Kastel,* 221 App. Div. 315.)

LOUGHRAN, Ch. J. On May 19, 1949, a Grand Jury presented in the Supreme Court of this State an indictment in this text:

" THE GRAND JURY OF THE COUNTY OF MONROE, by this indictment, accuse the defendant, George Hetenyi, of the crime of Murder in the First Degree, in violation of Section 1044, subdivision 1, of the Penal Law of the State of New York, committed as follows:

" The defendant, on or about April 22, 1949, in the County of Monroe, New York, wilfully, feloniously and from a deliberate and premeditated design to effect the death of Jean Gareis Hetenyi, killed the said Jean Gareis Hetenyi by shooting her twice in the body with a firearm, thereby inflicting injuries which resulted in and caused her death."

Jean Gareis Hetenyi was the wife of the defendant. Her bullet-pierced dead body was found in the Genesee River at a point within the county of Monroe on April 23, 1949.

The defendant has been twice tried upon the above indictment. Both trials were held in the County Court of Monroe County. On the first trial, the defendant was found guilty of murder in the second degree and was sentenced to imprisonment for an indeterminate period of time the minimum of which was to be not less than fifty years and the maximum of which was to be for his natural life (see Penal Law, §§ 1046-1048). The defendant challenged that judgment by an appeal to the Appellate Division, because the trial court did not submit to the jury the

question whether there was sufficient evidence of the place of the crime as alleged in the indictment, i.e., Monroe County, New York. Indeed the trial court in respect of that question said to the jury: " The finding of the body of the deceased, in the condition in which it was found within the confines of the County of Monroe, is sufficient as a presumption of law that the shots were fired in the County of Monroe ". It was impossible, of course, to sustain that ruling. Hence the Appellate Division reversed the first conviction of the defendant (277 App. Div. 310, 317) and, when the People brought that reversal to us for review, we affirmed the Appellate Division (301 N. Y. 757; see Code Crim. Pro., §§ 252, 355, and *People* v. *Hillman,* 246 N. Y. 467, 473).

The second trial resulted in a judgment convicting the defendant of murder in the first degree and accordingly he was sentenced to the punishment of death. (See Penal Law, §§ 1044–1045.) From that judgment of conviction, he then appealed directly to this court (see Code Crim. Pro., §§ 517–520).

On the second trial, the question in respect of the alleged place of the crime was submitted by the trial court to the jury in this manner:

" You will recall, ladies and gentlemen, that during the course of this trial a great deal has been said and much stress has been laid upon the question of the place where this killing occurred, that is, the venue or locus of the crime. I further charge you that, under this indictment, this defendant cannot be convicted of the crime charged or of any of the degrees of homicide unless you find this killing took place in Monroe County. This is a question of fact that must be determined by the jury.

" However, the standard of proof that is required under our law by which you are to determine this fact is distinctly different from the standard of proof required in determining the fact that the defendant did the killing. This distinction, ladies and gentlemen, is of great importance.

" You must find that the defendant killed the deceased beyond a reasonable doubt * * *.

" However, as to the place where the killing occurred, that is the locus or venue of the crime, the proof of that fact does not require proof beyond a reasonable doubt. The venue of the crime is not a part of the crime itself and need not be proven

beyond a reasonable doubt. In the absence of direct proof as to the venue, or the place where the killing occurred, that question may be determined by circumstantial evidence from all the relevant evidence.

" In this case there appears to be no direct evidence as to where the shooting actually took place, so you must rely upon circumstantial evidence in determining that fact; and, again, you are permitted to draw inferences from all the facts and circumstances in the case. *  *  *

" The proof is sufficient if, from all the facts and circumstances introduced in evidence, venue may be fairly and reasonably inferred. If, from the facts in evidence, the only rational conclusion that can be drawn is that the crime was committed in the county alleged, the proof is sufficient."

When it reversed the judgment entered on the first trial, the Appellate Division said: " The locus of the crime is not a part of the crime itself, and, as we view it, need not be proved beyond a reasonable doubt." In the same opinion, the Appellate Division also quoted with approval the rule expressed in American Jurisprudence (Vol. 20, Evidence, § 1220) in this way: " The proof is sufficient if, from all the facts and circumstances introduced in evidence, venue may be fairly and reasonably inferred." (277 App. Div., p. 315.) The rules regulating proof of venue in criminal cases as so laid down by the Appellate Division were on the second trial herein adopted by the Trial Judge as appears by the words we have already quoted from the charge which he delivered to the jury on that trial. We, too, concur in the views expressed by the Appellate Division on that branch of the case.

What follows has reference only to the second trial of the defendant which we now review on the direct appeal he has taken to this court from the judgment of conviction which on that trial was entered against him. We turn first to this basic question: Does the record before us exhibit evidence which justifies the jury's finding that the killing of the defendant's wife occurred in Monroe County, New York?

The wife of the defendant was last seen alive on Delaware Avenue in the city of Buffalo in Erie County, New York, at about 8:00 P.M. on Friday, April 22, 1949, by a witness who then and there saw her and the defendant enter an auto-

mobile which thereupon moved away. The defendant was next seen early in the morning of April 23, 1949, in the lobby of a hotel in the city of Rochester in Monroe County, and a little later was seen with his automobile on the Court Street bridge which spans the Genesee River in that city. At each of these places, the defendant had a conversation with a person who was a stranger to him and in both conversations he made inquiries in respect of the course and flow of the Genesee River and in respect of a raceway which ran parallel to that river at Court Street.

It was about 4:00 P.M. on April 23, 1949, when the dead body of the defendant's wife was found in the Genesee River. An hour later, an autopsy was performed upon the body by a coroner's physician who, as a witness for the People, gave the following testimony: (1) The wife of the defendant was not drowned but was dead when her body struck the water of the Genesee River; and (2) she died between 10:00 P.M. on Friday, April 22, 1949, and 6:00 A.M. on Saturday, April 23, 1949, "with a leeway of three or four hours either way." The same physician listed the causes of death as follows: two gunshot wounds in the chest, fractures of left ribs, perforation of left lung, blood and air in the pleural cavity, bullet wound in the spine, shock and hemorrhage.

The wife of the defendant was killed in his automobile. Numerous stains in which human blood was present were found inside that vehicle on April 26, 1949. A Rochester police officer later found in the vehicle a bullet which he compared with two bullets that had been recovered from the body of the defendant's wife. In the opinion of that officer as a ballistics expert all three bullets had been fired from the same pistol. The pistol was not found.

The last three paragraphs above are, we think, an adequate outline of the case made by the People. The facts there stated, as we believe, were an ample warrant for the finding by the jury that the crime in question was committed by the defendant in Monroe County, New York, as alleged in the indictment. Hence we pass to a consideration of the arguments that have been advanced in behalf of the defendant on this appeal.

The discovery of the body of the defendant's wife in the Genesee River was made by Mrs. Clara Beach at about 4:00 P.M.

on Saturday, April 23, 1949. At about 10:00 A.M. on that same day Mrs. Beach had been on the same riverbank at some distance from the spot where the body was later discovered by her. On that earlier occasion, she picked up a leather holster which she turned over to the Rochester police. According to expert witnesses for the People, that holster had been constructed to accommodate a twenty-five calibre pistol and other witnesses for the People testified that the defendant once had a similar holster in his possession.

In respect of the holster, however, counsel for the defendant at the conclusion of the charge said to the trial court: " I ask your Honor to charge that there being no proof that the holster, exhibit 14, was the same as previously seen in the defendant's possession, the jury may not draw an inference therefrom that the defendant was on the bank of the Genesee River in Monroe County and that he had a gun with which he there killed his wife in Monroe County." In response to that request, the trial court said: " I decline to so charge." But the trial court, at the request of the defendant's counsel, afterward added to its charge an instruction in this text: " If the jury find that this was the same holster they may not draw from that the inference that he possessed the gun which it accommodated." These last words of the court to the jury upon the subject of the holster must be taken, we think, to have reduced the evidentiary significance of that object to a minimum in the minds of the jury. Hence the admission of the holster into evidence was not, in our judgment, a material error.

The defendant did not take the witness stand nor did he call any witness in his behalf. In the course of the summation for the People, the District Attorney referred to the bloodstains that were found inside the defendant's automobile and then said that " nobody in the wide world with one exception " was ever going to tell the jury how the stains came to be there. In that summation, the District Attorney also remarked to the jury: " I say to you that that lonely dark place on the bank of the Genesee River is the place at which you can infer and must infer, in the light of all the evidence in the case, that this crime took place. By what ruse this defendant brought her down here you'll never know, nor I'll never know, not as long as he stands on his constitutional rights, so-called, but undoubtedly there

were some." In the course of his summation, the District Attorney also referred to the testimony of the witness who saw the defendant on the Court Street bridge in the city of Rochester on the night in question. In respect of that testimony, the District Attorney said: " * ○ * let me ask this very significant question, — has there been any explanation at all here as to why he was on that bridge by the defense? Not one word. Any explanation indeed as to what he was doing in the city of Rochester the very night his wife's body was placed in the Genesee River? "

At the close of the summation of the District Attorney, counsel for the defendant said: " I except to that portion of his summary in which he said in substance: ' You and I will never know; he still stands on his constitutional rights.' " For a final word, the District Attorney then said: " If he stands on his constitutional rights." Despite the exceptions taken by the defendant's counsel, the Trial Judge ignored the District Attorney's repeated accentuation of the defendant's failure to testify. These errors had an obvious tendency to make the trial unfair and cannot be dismissed as merely technical mistakes (see *People* v. *Minkowitz,* 220 N. Y. 399, 404–405).

The People were allowed to show the defendant to have been a clergyman who had given up one religion for another at frequent intervals. The reason why that evidence was offered is not obscure. In respect of that evidence the District Attorney in his summation declared to the jury: " I say to you this, ladies and gentlemen, — I say it in all seriousness, — that you may conclude from his ecclesiastical history certainly one thing, — here's a man to whom religion is a fraud, who engages in it purely and simply for selfish reasons. Faith to him means nothing. He can transfer from faith to faith to faith when it serves his own selfish interest best. * * * I say to you that from that fact you get at least this aspect of this defendant, and it is all incorporated in that all-informative word, a word none of us like to use, but occasionally must fasten on our fellowman, a renegade, and it shows the character of the man and the character of the man is important in your determinations as to whether he would have committed the crime which has been charged against him."

Thus the prosecution breached a firmly established rule of our law which in *People* v. *Zackowitz* (254 N. Y. 192, 197) was stated by CARDOZO, Ch. J., in this way: " Fundamental hitherto has been the rule that character is never an issue in a criminal prosecution unless the defendant chooses to make it one * * *. In a very real sense a defendant starts his life afresh when he stands before a jury, a prisoner at the bar." (See 1 Wigmore on Evidence [3d ed.], §§ 57, 192.) The rule thus forcibly expressed is a rule of fundamental fairness in the protection of the individual against unjust prosecution and is inflexibly enforced in our courts. Hence, we may not overlook a breach thereof as not affecting the substantial rights of an accused within the meaning of section 542 of the Code of Criminal Procedure, " when the purpose and effect of the breach is to create prejudice against the defendant by proof that his character is bad, even if the evidence convinces us of the defendant's guilt." (*People* v. *Nuzzo,* 294 N. Y. 227, 233, 234.)

The judgment of conviction should be reversed and a new trial ordered.

DYE, J. (dissenting). George Hetenyi stands convicted of the crime of murder in the first degree and awaits execution of a duly imposed sentence of death for having, as charged in the indictment, " on or about April 22, 1949, in the County of Monroe, New York, wilfully, feloniously and from a deliberate and premeditated design * * * killed [his wife] Jean * * * by shooting " (Penal Law, § 1044, subd. 1).

We all agree with the Chief Judge when he says in the prevailing opinion that " The facts there stated, as we believe, were an ample warrant for the finding by the jury that the crime in question was committed by the defendant in Monroe County, New York, as alleged in the indictment ", for on this record the evidence of defendant's guilt of the crime charged is indeed incontestable. Nonetheless, a majority take the view that the judgment of conviction should be reversed and a new trial ordered on the ground that the defendant was prejudiced before the jury, when the Monroe County District Attorney, in the course of his summation in behalf of the People, made remarks which, it is said, might reasonably be understood by the jury as an unfavorable reference to defendant's failure

to take the stand in his own behalf, and that he had a bad character.

We have no quarrel with the fundamental soundness of these ancient safeguards and their obvious purpose to assure that an accused shall stand before the bar of justice clothed in the presumption of innocence and with an unblemished character. We are unable however, to agree that on this record the summation by the District Attorney in behalf of the People prejudiced this defendant in a substantial right. It is not unusual that in a long drawn-out and closely contested case followed by an exhaustive summation, sometimes counsel carelessly and thoughtlessly make remarks that on reconsideration are deemed not only indiscreet and unwarranted by the evidence, but which, if allowed to stand without being corrected, may prejudice a substantial right. Under long-established practice such happenings are not necessarily fatal to the whole case but may be effectively cured by the court under a proper charge to the jury. This, we believe, is indubitably such a case.

According to the record, the People introduced evidence showing the presence of many bloodstains inside the defendant's automobile. In the course of his summation the Monroe County District Attorney commented on this proof saying in substance that the presence of such bloodstains could be explained by '' nobody in the wide world with one exception '' which, it is said, might be taken by the jury as an unwarranted reference to defendant's failure to testify in his own behalf with consequent prejudice to a substantial right (Code Crim. Pro., § 393).

At another point, while narrating the sequence of proven events connecting the defendant with the crime, the District Attorney spent some time in detailing the circumstance of the finding of the victim's body in the Genesee River, and the difficulty experienced by the authorities in establishing identity. In this connection the testimony of Sheriff Skinner, a witness for the People, was discussed. He had testified, in substance, that when he went to defendant's home in Buffalo and asked him to go to Rochester — and this at a time before the defendant had been accused of any crime and before his arrest — for the purpose of aiding in the identification of the woman's body found in the Genesee River and believed to be defendant's wife, the defendant had refused saying: '' I stand

on my Constitutional rights.'' All of this evidence had been received without objection and was in the case for all purposes. It is in connection with such proof that the District Attorney is now said to have commented unfairly and to defendant's prejudice, when he said: '' By what ruse this defendant brought her down here [that is to the river] you'll never know, nor I'll never know, not as long as he stands on his constitutional rights, so-called ''.

When viewed in the light of the whole record and the whole summation, we cannot say that these comments by the District Attorney so exceeded the bounds of fair comment as to injure and prejudice the defendant before the jury in a substantial right. We are persuaded to this view by the circumstance that the trial court in his charge expressly instructed the jury '' to consider the statements and arguments of counsel on either side only when they are based upon the evidence '' and admonished them to '' disregard any statement, comment or argument which is not supported by the evidence.'' To make doubly sure that the jury would draw no unfavorable inference, if indeed it were at all possible, he expressly instructed them as follows: '' The defendant in this case, as you have observed, did not take the stand in his own behalf. Under the law of this State he has a perfect right so to do. He may testify in his own behalf but he is not obliged to do so if he does not choose to do so. The law in this State expressly provides that his neglect or refusal to so testify does not create any presumption against him.'' The possible unfavorable effect resulting from the District Attorney's comment during summation, if indeed any existed, must be deemed to have been cured and corrected by this charge (*People* v. *Priori*, 164 N. Y. 459), particularly when the proof clearly points to defendant's guilt (*People* v. *Gillette*, 191 N. Y. 107), which principle has been reiterated in *People* v. *Watson* (216 N. Y. 565), and may well be regarded as firmly imbedded in our criminal practice. The case of *People* v. *Minkowitz* (220 N. Y. 399), relied on by a majority, is not to the contrary, for there the court failed, on request of defendant's counsel, to direct the jury to disregard comments made by the District Attorney during his summation on behalf of the People that the defendant had failed to take the stand. In *People* v. *Forte* (277 N. Y. 440, 441–442), the court specifically charged that while the

jury might not draw any unfavorable inference because of defendant's failure to testify it was '' warranted in taking the facts and circumstances established in the case, which, if he were innocent, he might have controverted or explained, most strongly against him.'' While that was not a capital case it nonetheless illustrates that the rule relating to the inference to be drawn from the failure of a defendant to take the stand in a civil case may not be transposed for use against an accused in a criminal case by the court's charge. The very recent case of *People* v. *Leavitt* (301 N. Y. 113), among other issues dealt with the extremely inconclusive nature of the circumstantial proof as well as other trial errors warranting reversal. In addition, we also note that the trial court over defendant's objection and request, did not advise the jury that the defendant's failure to take the stand in his own behalf would not create any presumption against him, an omission which could not very well be overlooked in the circumstance of that case (Code Crim. Pro., § 393).

In the light of these authorities any unfavorable presumption arising from the District Attorney's remarks — if deemed to have exceeded the bounds of fair comment — must be regarded as having been effectively cured by the subsequent charge to the jury — and had no effect on the verdict — which, as we all agree, is amply supported by the evidence.

We turn now to a consideration of the language used by the District Attorney in commenting on defendant's frequent and successive changes in his religious affiliations when he said: '' and it shows the character of the man and the character of the man is important in your determinations as to whether he would have committed the crime which has been charged against him.'' A majority regard this as an attack on the defendant's character which was not an issue in the case, and thus injured him in a substantial right.

We cannot accept such view. Inept words by counsel during summation, whether carelessly or deliberately spoken, should not be used to set aside a verdict unless it appears that the verdict depended thereon. Here the verdict, as we have said in the prevailing opinion, has '' ample warrant '' in the evidence. In fact, no other verdict could very well have been found under any reasonable view of the evidence. In this state

of the record it cannot very well be said that the verdict was in any way dependent on the remarks complained of. If the overwhelming evidence in this case is not enough to overcome the alleged unfavorable presumption, further answer is to be found in the record.

Throughout the trial of this case the defendant's religious peregrinations were inextricably intertwined in the proof. The defense counsel examined prospective jurors in respect to it. In his opening statement he admonished the jurors to remember that the defendant was being tried for murder in the first degree and not " for having been a Catholic priest or for having been a Greek Orthodox priest or for having been a Methodist minister or for having been an Episcopalian minister * * *. You must remember this man is charged with murder, not with leaving one faith and joining another. * * * ' Will you look to it to see that the People sustain the burden of proving not the change of religion, but murder in the first degree.' "

When proof of defendant's religious background was offered by the People not a single objection was made to the evidence that the defendant, a native of Hungary, had been ordained a Roman Catholic priest and had performed ecclesiastical duties in the Roman Catholic Church in both this country and Canada for several years, when he renounced his vows in order to marry the victim herein and then by successive stages changed his religious affiliations finally serving as a probationary assistant in the Episcopal Diocese of Western New York. The defense counsel, during his summation to the jury, commented at length and exhaustively on this phase of defendant's life — not that such evidence was improperly admitted, but that it had no probative value in determining the issue of defendant's guilt. The jury thus heard defense counsel make repeated reference to defendant's religious affiliations from the beginning to the end of this long trial (April 25, 1951, to May 12, 1951).

We must bear in mind that the alleged harmful comment by the District Attorney came in the course of a long and detailed summation and had reference to a phase of the defendant's prior religious life, that had little, if any, bearing on the issue being tried and which no reasonable person could possibly interpret as indicating a propensity and tendency to commit the crime of which he was charged. We must give the jury credit

for being persons of common sense and not totally devoid of reasoning power. The character rule is designed to assure that the accused will stand before the jury unblemished by his past — particularly free from any showing that he is guilty of any crime, in a legal sense, other than the one with which he is charged, or that his past conduct is such as to indicate a propensity to commit the crime charged and furnish an excuse therefor.

An analysis of the leading cases in which the character rule has been applied all point to the conclusion that the prejudice constituting reversible error arises when *testimony is received in evidence* which tends to establish the commission of a crime other than the one with which the accused is charged (*People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Richardson,* 222 N. Y. 103; *People* v. *Thompson,* 212 N. Y. 249; *People* v. *McLaughlin,* 150 N. Y. 365; *People* v. *Mullens,* 292 N. Y. 408; *People* v. *Nuzzo,* 294 N. Y. 227).

In the *Zackowitz* case (*supra*) proof was adduced showing that the defendant was guilty of another crime for which he was not charged, viz., unlawful possession of two pistols concededly not used in connection with the homicide for which he was being tried, admission of which was deemed by this court as an endeavor to generate an atmosphere of professional criminality.

Much the same situation existed in *People* v. *Mullens* (*supra,* p. 418), where proof, if credited by the jury, indicated commission of a crime not charged, which we viewed as without '' any probative force save as thereby it was implied that the defendants were men whose experience had predisposed them to the commission of offenses of the sort for which they were on trial. Since these numerous extraneous crimes were allowed to be taken into account, we must conclude that the jury were influenced thereby ''.

Another recent case is that of *People* v. *Nuzzo* (*supra*), where again proof of other acts criminal in nature, unrelated to the offense charged, was received over objection, which on appeal was deemed error.

Under the authorities it seems quite clear that the reference to character which is condemned arises when testimony of nonrelated criminal acts is received over objection and which, if credited by the jury, would lead them to believe that the

accused had a tendency to commit the crime charged. In other words, that he had a bad character which could be taken as accounting for the commission of the crime for which he was being tried.

Here the proof relates not to other criminal conduct but to the defendant's religious background, a matter having nothing whatsoever to do with the crime of which he was charged. It was in the case because it could not very well be ignored. The inept language by the District Attorney was certainly not evidence and when analyzed in the setting in which it was spoken and in the light of all the proof it hardly seems possible that the jury could have regarded it as other than fair comment. A jury must be deemed possessed of the intelligence of the average man and we believe that the jury here brought in their verdict because the proof was overwhelming that the defendant committed the crime of which he was charged, and not because of any comment made by the District Attorney during his summation. We believe it reasonable to suppose that the defense counsel and the trial court were of the same view at the time since no objections were taken to such remarks and no requests were made of the court to instruct the jury respecting them. While under our practice the review of a capital case does not depend on noted objections and exceptions, nonetheless it is significant that the defense counsel at the trial made no complaint that such language was prejudicial, while at the same time he devoted several pages of the record to the making of requests to charge relating to other items, some of which were granted and some of which were refused, which rulings, we all agree on this appeal, were properly made. When the comments of the District Attorney are viewed in the light of the whole record and this case is compared with the pattern heretofore followed in other cases, we should regard the alleged prejudice as insubstantial and we should affirm the judgment of conviction herein without regard to any possible technical invalidity under the provisions of section 542 of the Code of Criminal Procedure.

LEWIS, CONWAY and FROESSEL, JJ., concur with LOUGHRAN, Ch. J.; DYE, J., dissents in opinion in which DESMOND, J., concurs; FULD, J., dissents and votes to affirm under the provisions of section 542 of the Code of Criminal Procedure.

Judgment of conviction reversed, etc.